**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| DUSTIN BROWN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |  |
| Plaintiff, | ) ) ) | Case No. 1:17-cv-01728 |
| v. | ) ) | **CLASS ACTION COMPLAINT FOR** |
| MULTI PACKAGING SOLUTIONS INTERNATIONAL LIMITED, MARC SHORE, ZEINA BAIN, GEORGE BAYLY, RICHARD H. COPANS, ERIC KUMP, GARY MCGANN, THOMAS S. SOULELES, and JASON TYLER, | ) ) ) ) ) ) ) ) | **VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |
| Defendants. | ) ) |  |

Plaintiff Dustin Brown ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Multi Packaging Solutions International Limited ("Multi Packaging" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Multi Packaging, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Merger") between Multi Packaging, WestRock Company ("Parent") and WRK Merger Sub Limited ("Merger Sub," and together with Parent, "WestRock").

2.      On January 23, 2017, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive $18.00 in cash for each share of Multi Packaging common stock they own  (the "Merger Consideration").

3.      On March 3, 2017, in order to convince Multi Packaging shareholders to vote in favor of the Proposed Merger, the Board authorized the filing of a materially incomplete and misleading Definitive Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for the Company; (ii) the valuation analyses performed by the Company's financial advisor, BofA Merrill Lynch, in support of its fairness opinion; and (iii) a significant conflict of interest BofA Merrill Lynch faced as a result of its sizeable holdings in WestRock.

6.      The special meeting of Multi Packaging shareholders to vote on the Proposed Merger is scheduled for April 5, 2017.  It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote, so that they can properly exercise their corporate suffrage rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 and

Regulation G, 17 C.F.R. § 244.100.  Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to Multi Packaging shareholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Multi Packaging maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a Multi Packaging shareholder.

12.     Defendant Multi Packaging is incorporated in Bermuda and maintains its principal executive offices in New York, New York.  The Company offers print-based packaging solutions, including folding cartons, inserts, labels, and rigid packaging across a variety of substrates and finishes.  Multi Packaging serves the consumer, healthcare, and multi-media markets worldwide.

13.     Individual Defendant Marc Shore is, and has been at all relevant times, the Company's Chief Executive Officer and the Chairman of the Board.

14.     Individual Defendant Zeina Bain is, and has been at all relevant times, a director of the Company.

15.     Individual Defendant George Bayly is, and has been at all relevant times, a director of the Company.

16.     Individual Defendant Richard H. Copans is, and has been at all relevant times, a director of the Company.

17.     Individual Defendant Eric Kump is, and has been at all relevant times, a director of the Company.

18.     Individual Defendant Gary McGann is, and has been at all relevant times, a director of the Company.

19.     Individual Defendant Thomas S. Souleles is, and has been at all relevant times, a director of the Company.

20.     Individual Defendant Jason Tyler is, and has been at all relevant times, a director of the Company.

## CLASS ACTION ALLEGATIONS

21.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Multi Packaging (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

22.    This action is properly maintainable as a class action because:

a.    The Class is so numerous that joinder of all members is impracticable.  As of March 3, 2017, there were approximately 77.7 million shares of Multi Packaging common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of Multi Packaging will be ascertained through discovery;

b.    There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)      whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

ii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.      The Merger Consideration Appears to be Inadequate in Light of Multi Packaging's Recent Financial Performance**

23.      Multi Packaging was founded in 2005 and is headquartered in New York, New York.  The Company prints, manufactures, and sells paperboard, paper, and plastic packaging products in North America, Europe, and Asia.  The Company also provides labels and rigid packaging products, as well as other consumer packaging products that include transaction cards, point-of-purchase displays, brochures, product literature, marketing materials, grower tags, and plant stakes.  In addition, it offers a range of value-added services, such as digital workflow, creative, pre-press, vendor managed inventory, late stage customization, co-located facilities, and

brand protection/e-pedigree services, as well as environmental, new product development, and customized supply chain solutions. The Company serves personal care, spirits, cosmetics, confectionary, healthcare, and multi-media markets.

24.    The Merger Consideration Multi Packaging shareholders stand to receive if the Proposed Merger is consummated appears to inadequately compensate them for their shares. Indeed, the Merger Consideration represents a measly premium compared to the Company's pre-merger-announcement 52-week high closing price of $17.07.

25.    The Merger Consideration also appears inadequate in light of the Company's recent financial performance. Indeed, on February 13, 2017, the Company announced positive financial results for the second quarter, including GAAP (generally accepted accounting principles) operating income of $24.9 million, compared to $7.1 million during the same quarter the previous year. The Company's year-to-date GAAP operating income was $52.6 million, versus $47.8 million during the same period the previous year. Individual Defendant Shore also announced that the Company has "taken several steps to drive organic growth and operational improvements," which are expected to help the Company grow even in light of the headwinds the entire industry has faced recently.

26.    Further, the Company's stock price increased approximately 18% between November 11, 2016 and January 11, 2017, signifying that the Company's intrinsic value continues to grow.

27.    The inadequate Merger Consideration is the result of a flawed sales process. Specifically, the Proxy indicates that the Board did not expand its search for strategic alternatives to maximize shareholder value with other parties, and instead focused solely on finalizing a transaction with WestRock.

28.     In sum, it appears that the Merger Consideration fails to adequately compensate Multi Packaging shareholders, and is the result of a flawed sales process during which Company management and the Board failed to conduct a sufficient and robust review of strategic alternatives.  It is therefore imperative that the Company's shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and make an informed decision concerning whether or not to vote in favor of the Proposed Merger.

## II.     The Merger Agreement's Deal Protection Provisions Deter Superior Offers

29.     In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Multi Packaging.

30.     First, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Multi Packaging shareholders.  The Merger Agreement generally states that the Company and the Individual Defendants shall not: (i) initiate, solicit, propose or knowingly encourage or knowingly facilitate any inquiry or the making of any proposal or offer that constitutes, or would reasonably be expected to lead to, an acquisition proposal; (ii) engage in, continue or otherwise participate in any discussions or negotiations relating to any acquisition proposal; or (iii) provide any non-public information to any person in connection with any acquisition proposal.

31.     Additionally, the Merger Agreement grants WestRock recurring and unlimited matching rights, which provides it with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) several days to negotiate with Multi Packaging, amend the terms of the Merger

Agreement and make a counter-offer in the event a superior offer is received.

32.    The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that WestRock can easily foreclose a competing bid.    As a result, these provisions unreasonably favor WestRock, to the detriment of Multi Packaging's public shareholders.

33.    Lastly, the Merger Agreement provides that Multi Packaging must pay WestRock a termination fee of $42.4 million in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal.    The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide Multi Packaging shareholders with a superior offer.

34.    Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

35.    Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that Multi Packaging's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Merger.

### III.    The Materially Incomplete and Misleading Proxy

36.    On March 3, 2017, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger.    The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger.    The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.    However, the Proxy

misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

37.    First, the Proxy fails to provide material information concerning the Company's financial projections.  Specifically, the Proxy provides projections for non-GAAP (generally accepted accounting principles) metrics, including EBITDA and EBIT, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures.

38.    When a company discloses non-GAAP financial measures in a Proxy, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method), of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

39.    Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders.  The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Multi Packaging has included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.    And last month, the staff issued guidance

addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[1]

40.     In recent months, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[2]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[3]  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

41.     In order to make the projections included on page 45 of the Proxy materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures (EBITDA and EBIT) to the most comparable GAAP measures.  Indeed, the Company

---

[1] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

[2] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[3] *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

routinely provides such a reconciliation table in its quarterly financial results releases, and it can therefore undoubtedly provide such a reconciliation table for the projections included in the Proxy without unreasonable efforts.

42.    At the very least, the Company must disclose the line item projections for the financial metrics that were used to calculated the non-GAAP measures EBITDA and EBIT, (*i.e.*, net income excluding net interest expense, income tax expense, depreciation and amortization). Such projections are necessary to make the non-GAAP EBITDA and EBIT projections included in the Proxy not misleading.  Indeed, the Defendants acknowledge that disclosing non-GAAP projections may mislead shareholders in the Proxy: "GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by MPS may not be comparable to similarly titled amounts used by other companies."  Proxy 45.

43.    The Proxy also fails to disclose "the standalone unlevered, after-tax free cash flows that Multi Packaging was forecasted to generate during MPS's third quarter of fiscal year 2017 through fiscal year 2019 (Proxy 41).   Under sound corporate finance theory, Multi Packaging shareholders would find such cash flow projections material in assessing the fairness of the Merger Consideration.  Indeed, when stockholders must vote on a transaction in which they will receive cash for their shares, information regarding the financial attractiveness of the deal is of particular importance.  This is because the stockholders must measure the relative attractiveness of retaining their shares versus receiving a cash payment, a calculus heavily dependent on the stockholders' assessment of the company's future cash flows.  The omission of the cash flow projections renders the projections set forth on page 45 of the Proxy, as well as the summary of BofA Merrill Lynch's Discounted Cash Flow Analysis on page 41, materially

incomplete and misleading.  If a proxy discloses projections, such projections must be complete and accurate.

44.    Indeed, financial experts agree that projections for EBITDA, which are included in the Proxy, are not a sufficient substitute for cash flow projections when attempting to understand the value of a company.  As Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder.  Too many investors focus on earnings before interest, taxes, depreciation and amortization.  That makes sense, only if you think capital expenditures are funded by the tooth fairy."[4]

45.    Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls.  EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs which are critical to understanding a company's value.  As a result of these material differences between EBITDA and unlevered free cash flow, many analysts recognize unlevered free cash flow as a much more accurate measure when it comes to analyzing the expected performance of a company.  Disclosing EBITDA projections without cash flow projections is therefore inherently misleading.

46.    Additionally, the Proxy fails to disclose the Company's net operating loss ("NOL") forecast for fiscal year 2017 through fiscal year 2032 and the resulting present value calculated by BofA Merrill Lynch in connection with its Discounted Cash Flow Analysis.  Proxy 41.  A net operating loss is a loss taken in a period where a company's allowable tax deductions are greater than its taxable income.  When more expenses than revenues are incurred during the

---

[4]    Elizabeth MacDonald, *The Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.

period, the net operating loss for the company can generally be used to recover past tax payments. The Company's NOL forecast therefore relates directly to the Company's valuation, and is material to the Company's shareholders. The omission of the NOL forecast renders the projections set forth on page 45 of the Proxy, as well as the vague reference to the NOLs in the section of the Proxy summarizing BofA Merrill Lynch's Discounted Cash Flow Analysis on page 41, materially incomplete and misleading.

47. The Proxy also omits certain key inputs necessary for shareholders to assess the valuation analyses performed by BofA Merrill Lynch in support of its fairness opinion, rendering the summaries of such analyses in the Proxy incomplete and misleading.

48. With respect to BofA Merrill Lynch's Discounted Cash Flow Analysis, the Proxy fails to disclose: (i) the inputs and assumptions underlying the calculation of the discount rate range of 8.2% to 9.8% used by BofA Merrill Lynch; (ii) the terminal year estimated unlevered, after-tax free cash flow amount to which the perpetuity growth rate range was applied; (iii) the resulting calculated ranges of terminal values from using both perpetuity growth rates and terminal forward EBITDA multiples; and (iv) the line items used to calculate unlevered free cash flow, including taxes, changes in net working capital, and stock-based compensation expense.

49. These key inputs are material to Multi Packaging shareholders, and their omission renders the summary of BofA Merrill Lynch's Discounted Cash Flow Analysis on page 41 of the Proxy incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L.

Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> **There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion <u>unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices</u>.** The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions. *Id.* at 1577-78.

50.     With respect to BofA Merrill Lynch's Selected Publicly Traded Companies Analysis (Proxy 39) and Selected Precedent Transactions Analysis (Proxy 40-41), the Proxy fails to disclose the individual multiples BofA Merrill Lynch calculated for each company and transaction utilized. The omission of the individual multiples for each company and transaction renders the summary of these analyses and the implied per share equity value reference ranges set forth on pages 40-41 of the Proxy materially misleading. A fair summary of a Selected Publicly Traded Companies Analysis and Selected Precedent Transactions Analysis requires the disclosure of the individual multiples for each company and transaction; merely providing the range that a banker applied is insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.

51.     Further, according to Bloomberg, Bank of America Corporation currently holds 1,187,881 shares of WestRock common stock, valued at approximately $61.1 million based upon

WestRock's $51.43 trading price as of March 8, 2017. However, the Proxy fails to disclose this significant conflict of interest, which undoubtedly constitutes material information to Multi Packaging's shareholders. Indeed, it is imperative for shareholders to be able to understand what factors might influence a financial advisor's analytical efforts. A financial advisor's own proprietary financial interest in a Proposed Merger must be carefully considered in assessing how much credence, if any, to give its analysis. A reasonable shareholder would want to know an important economic motivation of the advisor employed by a board to assess the fairness of the transaction to shareholders, when that motivation could rationally lead the advisor to favor a deal at a less than optimal price, because the procession of a deal was more important to him, given his overall economic interest, than only doing a deal at the right price. The omission of this information renders the vague, boiler-plate statement on page 43 of the Proxy that BofA Merrill Lynch generally invests or holds positons in WestRock securities incomplete and misleading, because that statement fails to *quantify* the significance of BofA Merrill Lynch's current holdings in WestRock.

52.    In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

53.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

54.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

55.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

56.     SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement.  The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading*." 17 C.F.R. § 244.100(b).  The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly

comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.   17 C.F.R. § 244.100(a).   As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

57.     The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

58.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger.   Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company; and (ii) the valuation analyses performed by BofA Merrill Lynch; and (iii) a significant conflict of interest BofA Merrill Lynch faced as a result of its sizeable holdings in WestRock.

59.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.   Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).   The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

60.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information

identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that BofA Merrill Lynch reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided by BofA Merrill Lynch as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and knew or should have known of the conflicts faced by BofA Merrill Lynch.

61.    The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to review BofA Merrill Lynch's analyses in connection with their receipt of the fairness opinion, question BofA Merrill Lynch as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

62.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

63.    Multi Packaging is also deemed negligent as a result of the Individual

Defendants' negligence in preparing and reviewing the Proxy.

64.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

65.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

<u>**COUNT II**</u>

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

66.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

67.     The Individual Defendants acted as controlling persons of Multi Packaging within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Multi Packaging, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

68.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

69.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing this document.

70.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

71.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

72.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

73.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.      Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 8, 2017

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By:  /s/ *Nadeem Faruqi*
Nadeem Faruqi
James M. Wilson, Jr.
685 Third Avenue, 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331
Email: nfaruqi@faruqilaw.com
jwilson@faruqilaw.com

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building

350 Fifth Avenue, 59th Floor
New York, NY 10118
Tel: (212) 971-1341
E-mail: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*